## DILLAYE *vs.* THE NEW YORK CENTRAL RAILROAD COMPANY.

A train of cars ran every afternoon and evening, upon the defendant's road, from Rochester to Syracuse, which, though usually called a cattle train, had an ordinary passenger car attached, capable of containing at least fifty passengers. It had a conductor, who, in addition to his agency in regard to the freight, was accustomed, at all his stopping places, to take on all passengers who applied to him to be carried on the road. He was empowered to collect the usual fare from such passengers, and he was authorized to collect, and did collect, the tickets of such persons on the train as had procured them before entering the train. He stopped at all the way stations between Rochester and Syracuse; and he carried all passengers, male and female; and no special application was necessary to obtain a seat in the passenger car. In short, though the main business of the train was to carry cattle, it was a part of its regular business, daily, to carry such passengers as applied. *Held* that whatever the company chose to denominate this train, it was really a *freight* and *passenger* train.

*Held, also,* that it was not a material circumstance that the company did not check baggage, for the passengers on that train, or that the passengers were left to take charge of it themselves.

*Held, further,* that the company was bound to see that there was a safe and commodious passage way from the station, or ticket office, to the place where the passenger car usually stopped; and that it was liable in damages

for any injury sustained by an intending passenger upon the train in question, in falling into an improperly constructed cattle-guard, in consequence of the negligence of the company.

THIS case came before the court on a motion for a new trial upon a nonsuit ordered at the Onondaga circuit, and the motion was ordered to be heard at the general term in the first instance.

The plaintiff claimed to recover for a personal injury sustained by him by falling into a cattle-guard, on the line of the defendant's railroad, in Clyde, which he alleged was improperly constructed. The defendant denied the allegations of the complaint, and set up also that the plaintiff's own negligence caused or contributed to the injury which he sustained. The cause was tried before a jury.

It appeared that the defendant, in 1862, run daily on their road a through cattle train, and which, between Rochester and Syracuse, at least, had attached to the rear of it a common passenger car, upon which the company transported all such passengers as made application to ride thereon. That that train was due at Clyde, when going east, at a little after 8 o'clock in the evening. That passengers going from Rochester to Syracuse, and way passengers at all points between those places, were in the habit of riding on that train, whenever they applied to do so, and that female as well as male passengers were accustomed to ride thereon. That persons riding on express trains, who desired to stop at Clyde, when the express did not stop there, were carried on such trains to the nearest point to Clyde at which they made stoppages, and such passengers were then left by the conductors to take the cattle train in question, to Clyde, the conductor on the cattle train taking up the passengers' tickets. That passengers were in the constant habit of leaving that train at Clyde, and of taking it there to go to points not farther east than Syracuse. That no tickets were sold at Clyde expressly for that train, and the ticket office there was not

kept open, on the arrival of that train, but that sometimes
tickets for express trains east were sold at Clyde, and the
purchasers were informed by the ticket agent that they
could take the cattle train to the first point east of there
at which the express trains stopped, and then change to
the express train. That no baggage was checked for that
train, but that if passengers had any baggage with them
they had to care for it themselves. That at Clyde, as well
as elsewhere between there and Rochester, the train did not
draw up and stop, so that the passenger car would be in
front of the ticket office, but in all instances the train was
stopped when the engine and tender were opposite to the
appropriate place for wooding and watering the train, and
from that point started again, and continued on to its next
stopping station. That at Clyde the train always stopped
when coming east, with the engine a few rods west of the
ticket office, and near where Sodus street crossed the rail-
road; that the train at such times occupied the north track
of the railroad, and extended westerly therefrom, from 30
to 40 rods or more, depending upon the length of the
train; and that the place where the passenger car was at
such times stopped, was always westerly of the Sodus road.
That it was usual for the conductor of the train, for such
passengers as took that train at Clyde or other stations,
to collect and receive the fare of each passenger, and to
collect the tickets of such of them as had procured tickets
before entering the train. That the defendant had con-
structed an open cattle-guard across the whole width of
their road on Sodus street, the westerly wall of which was
about eleven feet easterly of the westerly boundary of the
street; the two side walls of which were of stone, and per-
pendicular, and about four feet five inches apart, and of
the perpendicular depth of three feet and seven inches;
and that on the southerly track of the railroad the whole
space of the cattle-guard was open, except that there was
a bar of iron about two inches in diameter laid length-

Dillaye *v.* New York Central Railroad Company.

wise of said cattle-guard, across the south track of the rail-road, upon which persons could step in crossing the opening. That the defendant usually kept no light at that point, in the night, but employees were sometimes in the habit of lighting passengers across it, who desired to take, or who came from, the train; and that on two occasions before the time in question, passengers who were going towards the passenger car fell into the cattle-guard on the south track, and were more or less injured, which accidents were known to the employees of the defendant. That on the 20th of November, 1862, the plaintiff, who resided at Syracuse, went to Clyde on business, on one of the trains of the defendant, and was ready in time to take the cattle train on his return to Syracuse. That the train arrived at Clyde at about the hour of 8 o'clock in the evening, and stopped at its usual place. That it had a long train of cattle cars, so that the passenger car was some 30 to 40 rods west of the Sodus road, the night being quite dark and there being no light near the cattle-guard. The plaintiff, on learning the arrival of the train, left the public house where he was stopping, and passed toward the ticket office, and thence along westerly until he arrived opposite to the engine and tender of the train; and then informed one of the employees of the road, who stood by the engine with a light in his hand, that he desired to take passage on the train, and was informed by him that he must go to the passenger car, in the rear of the train. That he proceeded on a pretty fast walk, on the south track, (the train occupying the other,) until he fell into the cattle-guard and broke his leg. That the night was so dark that he could not see the opening, until he fell into it. That he had never before taken that train, and had been at Clyde but once or twice before, and did not know that Sodus street crossed the railroad, and was not aware of any cattle-guard being located there,

until he fell into it. It also appeared that there was no other way of getting from the ticket office to the passenger car, without climbing fences and going through the lands of individuals.

When the evidence on the part of the plaintiff was closed, the defendant's counsel moved for a nonsuit, on the ground that there was not sufficient evidence to sustain the action, and that the evidence on the part of the plaintiff showed that negligence on his part contributed to the injury. The court stated that it was unnecessary to inquire whether there was negligence on the part of the plaintiff, and held and decided:

1st. That there was not sufficient evidence to justify the jury in finding that the defendant invited travel upon the cattle train, which the plaintiff intended to take at the time of the injury, but that, on the contrary, it was quite apparent that the defendant took passengers upon said train only at their request, and to accommodate those who were anxious to avoid the delay of waiting for the regular passenger train.

2d. That the defendant was not bound, under the evidence, to furnish a safe way to the passenger car in the rear of the freight train for persons desiring to take passage, or for the plaintiff, under the circumstances of the case.

3d. That the defendant was not a common carrier of passengers by the train in question.

4th. That the defendant was under no duty to the public, or to the plaintiff, to provide a safe way to the rear car, to enable him to pass the excavation in question, on his way to take passage upon said train; and the court stated that if the defendant was a common carrier of passengers by the train, it was bound to stop the cars at the depot.

5th. That whether the cattle-guard was a nuisance in the highway, was a question between the defendant and the authorities of the town; and that as the plaintiff was not interested in the highway, he could not recover on the

Dillaye *v.* New York Central Railroad Company.

ground that the cattle-guard might be found to encroach on the highway as it was originally laid out.

The counsel for the plaintiff requested the court to submit to the jury all the questions of fact in the case, including those decided by the court as aforesaid, and also the right of the plaintiff to recover upon the whole facts.

The court refused to submit any of the questions of fact to the jury, and thereupon nonsuited the plaintiff.

The counsel for the plaintiff excepted to the first, second, third, and first branch of the fourth and fifth propositions held and ruled by the court as aforesaid, and to each of them, respectively; and also to the refusal of the court to submit the questions of fact to the jury as requested, and also to the ruling of the court, granting the motion for a nonsuit.

*Charles Andrews*, for the plaintiff.

*Pratt, Mitchell & Brown*, for the defendant.

FOSTER, J. The cause has been ably argued by the respective counsel, and several adjudged cases have been referred to, to sustain the positions which they have advanced; but although the questions pending in the case are important, and of much interest to the parties and to the public at large, the difficulty of the case lies more in the determination of the true character of the train in question, than in the rules of law applicable to it, when that character is ascertained.

If it was a freight train merely, upon which the company unwillingly permitted persons occasionally, in cases of emergency, or for the particular accommodation of such persons, alone, to ride thereon, then the company owed no duty towards them which has not been performed; and on the other hand, if it was a passenger train as well as a freight train, intended by the defendant for the trans-

Dillaye *v.* New York Central Railroad Company.

portation of way passengers as well as of cattle, or other freight, then I think it owed a duty to the passengers which has not been performed.

The real question therefore is, was this a freight train merely, or a passenger train as well as a freight train. An ordinary freight train is intended exclusively for the transportation of property and such employees of the company as are deemed necessary to transact the business of the train on the road. It never has a passenger car attached to it, except when some peculiar and uncommon circumstance renders it necessary. It has quite frequently and generally a small car at its rear end, which in this case I find is called a "cab," sufficient to carry the employees of the company, in which it sometimes happens that a passenger is admitted. There are also trains which are denominated "cattle trains," and they too usually have a "cab" attached, for the use of the employees of the road and of the owners or agents having the cattle in charge, and usually such trains are confined to the carrying of such employees and persons having charge of the cattle; though it sometimes happens that other passengers are carried in such trains. Such trains are undoubtedly freight trains; and it cannot be expected that the company should owe any duty to passengers who apply to ride on them, except to use ordinary care, in their behalf, while they are on board of the train.

Such trains have a conductor, whose business it is to see that the train has proper dispatch, and who has charge of the business connected with the freighting, but has no authority to admit on board such train, as passengers, persons who are not connected with the freight which he carries, or others, except by the direction of some superior officer of the company; and hence it is, that, as to passengers on such trains, there is no such obligation towards them as is the case in regard to those on passenger trains, and such trains, if through trains, stop only when by the

time tables of the company it becomes necessary for them to get out of the way of faster trains, running behind them, on the same track, or when necessary for taking on wood or water.

Was the train in question mainly or essentially of the above character? It ran every afternoon and evening from Rochester to Syracuse. It had an ordinary passenger car attached, which, of course, could contain at least fifty passengers. It had a conductor, who, in addition to his agency, in regard to the freight, was accustomed, at all his stopping places, to take on all passengers who applied to him to be carried on the road. He was empowered to collect the usual fare from such passengers, and he was authorized to and did collect the tickets of such persons on the train as had procured them, before entering the train. He stopped at all the way stations between Rochester and Syracuse; and he carried all passengers, male and female; and no special application was necessary to obtain a seat on board the passenger car. In short, though the main business of the train was to carry cattle, it was a part of its regular business, daily, to carry such passengers as applied. In my judgment, whatever the company chose to denominate, the train it was really a *freight* and *passenger* train.

Its character, as a passenger train, did not depend upon whether it was drawn up and stopped before the ticket office, at the several stations where it halted; and I think the court erred in supposing that if it was a passenger train, the company was bound to have the passenger car stopped in front of the station house. I am not aware that such is the duty of the company, in any case; nor can they, in most cases, do so with all of their passenger trains. Ordinarily some of the cars of a passenger train are stopped in front of the station house; but whenever the train is large, as is very often the case, sometimes containing a dozen or more cars, the most of the train will

be stopped nearly as far from the station as was the passenger car in question. My opinion is, that in regard to passenger trains, the duty of the company is to so stop its cars that passengers shall have easy and safe access to and from the train, and the nearest streets or other avenues of travel.

I do not consider it a material circumstance that the company did not check baggage for the passengers on that train, or that the passengers were left to take charge of it themselves. It is certain that they never refused or declined to carry the passenger and his baggage on board of the train; and if they invited passengers to take that train, it may be a serious question whether the statute did not require them to check all such baggage. But it is not important to determine that question here, and I therefore do not discuss it.

Is it correct to say that the railroad company did not invite passengers to take that train, or that the train was so run exclusively for the accommodation of freight?

How is a railroad company to invite passengers to their trains except by providing suitable accommodations for them to ride; stopping so that they may get the trains; and taking and carrying all who apply? How else do they invite passengers to their trains? We know, as matter of fact, that they invite passengers to them, by putting up in their ticket offices time tables, stating the regular time for trains to pass the several stations; and as matter of fact, though not testified to in the case, that the train in question was entered on their time table.

But how can it be assumed, legally, that the passenger car of that train was not attached to it solely for the accommodation of passengers? The company ran express trains on its road, which stopped only at the more important stations. It ran also way mail trains and other accommodation trains, which stopped at all stations; and which took up and left passengers at points where the express

trains did not stop, as well as at others. And the train in question, running as it did for eighty-one miles, performed the office of an accommodation passenger train, and for aught the case discloses, saved the necessity of running one more train, devoted exclusively to the business of an accommodation passenger train. And I think we are not authorized in coming to the legal conclusion that a railroad company runs any of its trains for the benefit solely of others, at a pecuniary loss or inconvenience to itself. All are doubtless aware that including the damage to the rolling stock of a train, and to the rails by the friction caused by breaking up and stopping the train, together with the loss of motive power and motion, and the additional consumption of fuel, and loss of time, all stops of trains are expensive; and the use of this train at its business stopping places, in taking on passengers there, was a material saving of expense to the company, if without the stopping of this train some other train would have had to stop in its stead; and the only reason why that train did not draw up in front of the station may well be that it was to save the expense of the additional stop necessary to do so.

With the view I have of the case, I think the company was bound to see that there was a safe and commodious passage way from the station or ticket office of the company to the place where the passenger car usually stopped. It is clear to my mind that it did not do so, and therefore the defendant was guilty of negligence; and that such neglect of the company was the cause of the injury which the plaintiff sustained. I am inclined to the opinion that the location of the cattle-guard, in Sodus street, would of itself entitle the plaintiff to recover for any damages which he sustained by falling therein; but I prefer to rest my decision of negligence on the part of the defendant, on the grounds before stated. The court below did not pass upon the question of negligence on the part of the plain-

tiff, but granted the nonsuit upon other grounds; but as the question is raised before us by the counsel for the defendant, it is enough to say that the only ground upon which it is claimed that the plaintiff was negligent is, that by law it was the duty of the company to make and sustain suitable cattle-guards at all road crossings; and that there being a road where this cattle-guard was, the plaintiff was bound to know that law, and bound to presume that the company had made such cattle-guard, and therefore it was his duty to take care and not fall into it. But if it be so, while the party was bound to know that the cattle-guard had been made, it surely ought to follow that he was to suppose it had been constructed nearer the westerly line of the road than eleven feet east of it, and that it was not so constructed as to be dangerous.

I think, upon the whole case, there was no negligence on the part of the plaintiff shown on the trial, and that the company improperly constructed the cattle-guard; that by reason of such improper construction the plaintiff was injured; and that, at least, the whole case should have been submitted to the jury. A new trial should be granted, with costs to abide the event.

MULLIN, J., concurred.

BACON, J., did not sit.

MORGAN, J., gave no opinion.

New trial granted.

[ONONDAGA GENERAL TERM, April 4, 1865.  *Mullin, Morgan* and *Foster,* Justices.]